[No. E008114. Fourth Dist., Div. Two. Oct. 3, 1991.]

EDWIN D. McCULLOCH, Plaintiff and Appellant, v.
FORD DEALERS ADVERTISING ASSOCIATION OF SOUTHERN
CALIFORNIA, Defendant and Respondent.

COUNSEL

Nielsen & Glover and Sherry K. Salls for Plaintiff and Appellant.

Bruggeman, Smith & Peckham, Martin J. DeVries and George Bruggeman, Jr., for Defendant and Respondent.

## OPINION

**RAMIREZ, P. J.**—Plaintiff Edwin D. McCulloch appeals from a judgment entered following grant of the motion for summary judgment brought by defendant Ford Dealers Advertising Association of Southern California (Association). On appeal, plaintiff claims that the trial court erred when it determined as a matter of law that the presence of the Ford logo on promotional material for a drag race did not constitute an assertion by the Association that the statements on the promotional material were true, and that the Association was therefore not liable to plaintiff for negligent misrepresentation. We affirm.

### FACTS

On May 11, 1987, plaintiff filed a complaint for damages against, among many others, Pioneer Take-Out Corporation; Network Enterprises, Inc.; R. C. "Chuck" Foster; the Seven-Up Company; Ford Motor Company; Suzuki; Miller Brewing Company; the County of San Bernardino; and respondent in this appeal, the Association.

In the complaint plaintiff alleged that defendants Pioneer Take-Out Corporation (Pioneer), Network Enterprises, Inc. (Network), and R. C. "Chuck" Foster (Foster) had undertaken to stage and promote a car race at Glen Helen Park in San Bernardino County. The promotional materials prepared and distributed by these defendants invited the public to attend and participate in the race and stated that the winner of the race would receive a prize of $1 million, to be paid in $20,000 yearly installments for 50 years. Included on the promotional materials which had been distributed prior to the race were the corporate logos of a number of the corporate defendants named in the suit.

Plaintiff had submitted an application and had participated in the race and had won it, but defendants Pioneer, Network and Foster had refused to pay plaintiff the $1 million prize. Plaintiff's complaint included causes of action against those three defendants for breach of contract, fraud and deceit.

The complaint also alleged that a number of the remaining defendants, including the Association, were liable to plaintiff for the prize money under a theory of negligent misrepresentation. Plaintiff alleged that those defendants "had advertised the race in circulars, fliers, envelopes, entry forms, calendars, hats, t-shirts, and other media," thereby falsely representing to plaintiff that the winner of the race would receive $1 million in prize money

for winning the race. Those representations were false as plaintiff had won the race and no defendant had paid plaintiff his $1 million.

Plaintiff alleged that defendants "made these representations with no reasonable ground for believing them to be true" and with the intent to induce plaintiff to rely on the representations. Attached to the complaint was a copy of the promotional materials, including the official entry application, which had been distributed by Network prior to the race.

Defendant Association answered the complaint and shortly thereafter filed a motion for summary judgment contending that the Association made no misrepresentations and did not intend any reliance by plaintiff, and that plaintiff could not justifiably have relied upon the alleged representation of the Association.

Attached to the motion and the points and authorities of the Association was the sponsorship agreement which had been entered into between Network and the Association. The Association had entered into the agreement "to take advantage of such promotion and advertising opportunities that this Event may offer." These opportunities were to include prominent placement of the Ford name and logo at the track and on all race-related materials controlled by Network.

In return, the Association agreed to provide 16 Ford cars to be used for the "celebrity/sweepstakes" event at the race. The agreement provided, among many other things, that Network was to be responsible for obtaining and presenting any and all awards.

The registration instruction sheet which accompanied the entry application completed by plaintiff stated: "Pioneer Take-Out Corporation purchases a prepaid, non-cancellable insurance annuity guaranteeing yearly payments. Should the winner not live long enough to collect all benefits, payment continues to the winner's estate until the entire $1,000,000 is paid in full."

Following a hearing and discussion of the issues the trial court held that, as a matter of law, the presence of the Ford logo on the promotional material did not constitute an "assertion" by the Association within the meaning of Civil Code section 1710, subdivision 2, that the prize money would be paid. The court thus determined that plaintiff had failed to state a cause of action for negligent misrepresentation under that section, and granted the motion for summary judgment. Plaintiff now appeals.

DISCUSSION

On appeal, plaintiff first contends that the issue of whether the Association made an assertion was a triable issue of material fact, and that the trial court erred by deciding the question as a matter of law. Plaintiff also contends that the court decided the question incorrectly. We hold that the trial court correctly decided the issue and we affirm.

Civil Code section 1710, subdivision 2, defines deceit as "The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." ■■■ This appeal presents the question of whether the Association made an assertion of the truth of the matters contained in the promotional materials, which admittedly had been prepared by someone other than the Association, when it placed its logo on those promotional materials.

We have found no decisions which deal directly with the issue before us. However, several decisions on related issues shed light on the factors which must guide our decision in this case.

In *Hanberry* v. *Hearst Corp.* (1969) 276 Cal.App.2d 680 [81 Cal.Rptr. 519, 39 A.L.R.3d 173], plaintiff purchased a pair of shoes which were advertised in Good Housekeeping magazine and which had received the "Good House-keeping Consumers' Guaranty Seal." With respect to the seal the magazine stated, " 'We satisfy ourselves that products advertised in Good Housekeeping are good ones and that the advertising claims made for them in our magazine are truthful.' " (*Id.*, at p. 682.) Plaintiff slipped and was injured when she stepped on a smooth vinyl floor while wearing the shoes, and she filed suit against the publisher of the magazine for, among other things, negligent misrepresentation. The trial court sustained defendant's demurrer without leave to amend. (*Ibid.*)

In reversing the trial court on the cause of action for negligent misrepre-sentation the appellate court stated: "Implicit in the seal and certification is the representation respondent has taken reasonable steps to make an inde-pendent examination of the product endorsed, with some degree of expertise, and found it satisfactory. Since the very purpose of respondent's seal and certification is to induce consumers to purchase products so endorsed, it is foreseeable certain consumers will do so . . . ." (276 Cal.App.2d at p. 684.) The court noted, however, that "we are influenced more by public policy than by whether such cause of action can be comfortably fitted into one of the law's traditional categories of liability." (*Id.*, at p. 683.)

■■■ The fact that defendant was not in privity of contract with plaintiff did not relieve it of the responsibility to exercise ordinary care since "such

duty may arise out of a voluntarily assumed relationship if public policy dictates the existence of such a duty." (276 Cal.App.2d at p. 685, internal quotation marks omitted.)

Among the factors relevant to determining the existence of such a duty are " 'the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.' " (276 Cal.App.2d at p. 685, quoting *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]; see also *Hale* v. *George A. Hormel & Co.* (1975) 48 Cal.App.3d 73, 86-87 [121 Cal.Rptr. 144].)

The court in *Walters* v. *Seventeen Magazine* (1987) 195 Cal.App.3d 1119 [241 Cal.Rptr. 101], faced with somewhat similar factual circumstances, reached a different result. In *Walters*, plaintiff sued defendant magazine after being hospitalized for toxic shock following use of a tampon she saw advertised in its pages. The trial court sustained defendant's demurrer and the appellate court affirmed.

The appellate court distinguished *Hanberry*, noting that Seventeen magazine did not "in any way sponsor or endorse products advertised in its pages. There was no representation of quality, no promotional effort, and no attempt to induce the public to buy Playtex tampons beyond merely printing the advertisement." (195 Cal.App.3d at p. 1122.)

The court concluded that "In the absence of any cause of action supported by traditional theories, we are loathe to create a new tort of negligently failing to investigate the safety of an advertised product." (195 Cal.App.3d at p. 1122.) The court stated its view that such a tort would require publications to maintain a large staff to scrutinize and test each product offered, and that the enormous cost of that effort, combined with reduced advertising income, increased insurance rates, and tort judgments, would inevitably result in a dramatic drop in the number of publications in circulation. (*Ibid.*)

■ These decisions indicate that the question before us here must properly be decided as a determination of whether the law will impose on the Association a duty to investigate the truth of the matters set forth in the materials on which its logo appeared.[1]

---

[1]The case primarily relied on by the trial court, *Yanase* v. *Automobile Club of So. Cal.* (1989) 212 Cal.App.3d 468 [260 Cal.Rptr. 513], is not directly relevant to this analysis

Unlike *Hanberry*, defendant here made no affirmative statement, such as that contained in the Good Housekeeping seal, that it had investigated the truth of the claims made in the promotional material. Unlike *Walters*, however, the defendant here did stand to benefit from the publicity generated by the false statements.

Under an analysis of the factors used by the court in *Hanberry* to determine whether a duty existed, we find in the present case that the fact that the promotional materials were intended to affect the plaintiff would incline us toward a finding that the Association had a duty to investigate the truth of the statements made in those materials. So, too, would the foreseeability of harm to plaintiff resulting from statements that were false, and the certainty that plaintiff here suffered harm.

Balanced against these factors, however, is the remote connection between the Association's conduct and the injury suffered. The false statements in the promotional materials were clearly identified as having been made by someone other than the Association. The materials stated that "Pioneer Take Out presents 'The' $1,000,000 Drag Race!" Network was identified as the organizer of the race, and publicity rights were granted by participants to Network. The materials also stated that "Pioneer Take-Out Corporation purchases a prepaid . . . annuity." The Association took no affirmative part in making the false statements.

The only connection between the conduct of the Association and plaintiff's injury was an aura of legitimacy given to the race by the participation of a nationally known sponsor. While we recognize that may have been significant from plaintiff's point of view, we do not find it to be a sufficient basis for holding the Association as guarantor of the truth of all statements made by the organizers of the race.

Nor can we attach moral blame to the Association's conduct here. The Association had entered into a written agreement with Network, and from all indications had met its obligations under the contract. By a specific term in the agreement the Association had been relieved of any obligation to provide prizes. In the absence of any reason for the Association to believe that it had an obligation to investigate we are unwilling to attach moral blame to the Association's failure to investigate the truth of the statements made in the promotional materials.

because there the question was whether the defendant had a duty to investigate and include in its guidebooks information on the safety of the neighborhoods surrounding the hotels it evaluated. Here we are concerned with defendant's duty to investigate the truth of statements made by others, not its duty to provide additional information in its own publications. However, since the result reached by the trial court was correct it will be affirmed on appeal. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

And, finally, we consider the policy of preventing future harm. While we recognize that requiring the Association to investigate the truth of all materials to which it attaches its logo would reduce the risk of harm such as plaintiff suffered here, we also recognize that it would have a drastic impact on corporate sponsorship of events of every description. The risk of tort liability could bring an end to corporate sponsorship of all but the wealthiest of enterprises and could cripple the functioning of organizations at every level of our society.

We conclude, under an analysis of the factors set forth in *Hanberry* and based in large measure on considerations of public policy, that the Association had no duty to investigate the truth of the statements contained in the promotional materials.

In the absence of a duty to investigate whether or not the statements were true, the Association cannot be held to have asserted the truth of the matters set forth in the promotional materials. Accordingly, we hold as a matter of law that plaintiff failed to state a cause of action against the Association for negligent misrepresentation. Under these circumstances the Association is entitled to judgment as a matter of law, and the trial court correctly granted the Association's motion for summary judgment. (Code Civ. Proc., § 437c, subd. (c).)

### DISPOSITION

The judgment is affirmed.

Dabney, J., and Hollenhorst, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 23, 1992. Mosk, J., was of the opinion that the petition should be granted.